IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAMELA PHELPS,                                            CV. 04-1657-PK
                          Plaintiff,

v.                                                       FINDINGS AND
                                                         RECOMMENDATION

JOANNE B. BARNHART,
Commissioner of Social Security,
                          Defendant.
_____

PAPAK, Magistrate Judge:

INTRODUCTION

Plaintiff Pamela Phelps ("Phelps") brings this action for judicial review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

her application for Social Security disability insurance benefits ("DIB") under Title II of the

Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act.  This court has jurisdiction under 42 U.S.C. § 405(g).  For the reasons set forth

below, this court recommends that the Commissioner's final decision be reversed and remanded

for the calculation and award of benefits.

BACKGROUND

Phelps was 42 years old on the date of the hearing.  She completed 9th grade.  Phelps worked in the past as a restaurant hostess and a church janitor.  Phelps alleges disability due to fibromyalgia, osteoarthritis, and osteoperosis.  AR 54.[1]  She claims these conditions cause the following symptoms: muscle pain in both arms, elbows and knees, pain in the left hip, difficulty lifting anything from the ground, sitting too long, and getting up.  AR 54.

Phelps filed an application for DIB and SSI benefits on February 15, 2002, alleging disability beginning October 1, 2001.  With regard to Phelps's application for DIB benefits, Phelps was last insured on December 31, 2001.  Thus, to establish entitlement to DIB benefits, she must demonstrate that the onset of disability occurred on or before that date.  Phelps's application was denied initially and upon reconsideration.  On May 13, 2004, a hearing was held before an Administrative Law Judge ("ALJ").  In a decision dated July 13, 2004, the ALJ found Phelps not disabled and therefore not entitled to benefits.  On September 16, 2004, the Appeals Council denied Phelps's request for review, making the ALJ's decision the final decision of the Commissioner.

STANDARDS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

---

[1]Citations are to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

Page 2 - FINDINGS AND RECOMMENDATION

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record as a whole.  42

U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53

F.3d at 1039 (citation omitted).  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, if "the evidence is susceptible to

more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## MEDICAL RECORDS

The medical records accurately set forth Phelps's medical history as it relates to her

claim.  The court has carefully reviewed the records, and the parties are familiar with them.

Accordingly, only a brief summary appears below.

Phelps has a history of grand mal seizures that began in childhood and lasted until

approximately 18 years of age.

Phelps was originally diagnosed with fibromyalgia and osteoarthritis of the spine in

1999, but medical records detail complaints of arm pain as early as 1998.  Phelps received

various treatments including wrist splints, a tennis elbow band, and cortisone shots, and was

referred to physical therapy.  Her physician recommended vocational retraining as Phelps was

having difficulty performing her work duties without significant pain.

In May 2001, Phelps was referred by the Steps for Success GED program to Portland Community College for evaluation regarding difficulties she was having acquiring the basic skills needed to pass her GED tests.  AR 273.  Phelps  was assessed with a Full Scale IQ of 74 and a Verbal IQ of 67. AR 274.

In August 2001, Phelps began mental health counseling with Janet Ehrenfreund, M.SW., at Mt. Hood Community Health Center.  Phelps was diagnosed with major depressive disorder and a Global Assessment Functioning ("GAF") score of 55.[2]  Phelps also treated with Sue Hippe, Nurse Practitioner, for dysthymia, or chronic depression.  Treatment included Zoloft and Remeron.

On November 5, 2001, Phelps was referred to Dr. Sharon Labs, Ph.D., P.C., for a neuropsychological evaluation. Dr. Labs interviewed Phelps and administered a battery of intelligence tests.  Phelps's test results included a Verbal IQ score of 68.  Dr. Labs also determined that Phelps's basic reading, writing and math skills were at a fourth to fifth grade level.  Dr. Labs found that Phelps had a learning disorder, not otherwise specified, with specific deficits in auditory processing.  Additionally, Dr. Labs found that Phelps demonstrated a cognitive disorder, not otherwise specified, with deficits noted in short-term memory for both

---

[2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id* at 34.  A GAF score between 51 and 60 indicates "Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*

Page 4 - FINDINGS AND RECOMMENDATION

verbal and visual information. Dr. Labs assessed Phelps with a GAF of 40.[3]

Phelps continued to report and seek treatment for physical pain as well as depression. Phelps has at various times been placed on a number of prescription drugs including Prozac, Hydroxyzine, Vicodin, Zoloft, and Remeron.   Phelps reported favorable response to treatment with Zoloft and Prozac.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999):

Step One.  The ALJ determines whether claimant is engaged in substantial gainful activity.  If so, claimant is not disabled.  If claimant is not engaged in substantial gainful activity, the ALJ proceeds to evaluate claimant's case under step two.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Step Two.  The ALJ determines whether claimant has one or more severe impairments significantly limiting her from performing basic work activities.  If not, the claimant is not disabled.  If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three.  20 C.F.R. §§ 404.1520(c), 416.920(c).

───────────────

[3] A GAF score between 31 and 40 indicates "Some impairment in reality testing or communication (e.g. speech is at time illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. 2000)

Step Three.  The ALJ next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations found at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If so, claimant is disabled.  If claimant's impairment does not meet or equal one listed in the regulations, the ALJ's evaluation of claimant's case proceeds under step four.  20 C.F.R. §§ 404.1520(d), 416.920(d).

Step Four.  The ALJ determines whether claimant has sufficient residual functional capacity ("RFC") despite the impairment or various impairments to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the ALJ's evaluation of claimant's case proceeds under step five.  20 C.F.R. §§ 404.1520(e), 416.920(e).

Step Five.  The ALJ determines whether claimant is able to do any other work.  If not, claimant is disabled.  If the ALJ finds claimant is able to do other work, the ALJ must show a significant number of jobs exist in the national economy that claimant can do.  The ALJ may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the ALJ demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled.  If the ALJ does not meet this burden, claimant is disabled.  20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At step five, the burden shifts to the ALJ to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

Page 6 - FINDINGS AND RECOMMENDATION

THE ALJ'S FINDINGS

At step one, the ALJ found that Phelps had not engaged in substantial gainful activity since the onset of disability.  AR 19.  This finding is not in dispute.

At step two, the ALJ found that Phelps had "severe" impairments including the following: fibromyalgia, degenerative disc disease of the lumbar spine, an organic mental disorder, an affective disorder, and a personality disorder. AR 15, 19. This finding is not in dispute.

At step three, the ALJ found that Phelps's impairments did not meet or equal the criteria of any of the impairments of the Listings.  AR 16, 19.  This finding is in dispute.

Next, the ALJ developed Phelps's RFC and found she could lift ten pounds frequently and twenty pounds occasionally, sit for six hours in an eight-hour work day, stand or walk for six hours in an eight-hour work day, and  occasionally climb, stop, kneel, crouch or crawl.  The ALJ determined that Phelps should be limited to simple one to three step tasks with limited public interaction.  AR 18, 19. This finding is in dispute.

At step four, the ALJ found that Phelps could not perform any past relevant work.  AR 18, 19.  This finding is not in dispute.

At step five the ALJ found that Phelps could perform unskilled work that existed in significant numbers in the national economy, including laundry folder, parking lot cashier, and small product assembler.  AR. 18, 19.  Accordingly, the ALJ found that Phelps had not been under a disability at any time through the date of his decision. AR 19.  This finding is in dispute.

DISCUSSION

Phelps contends that the ALJ erred by (1) improperly finding that Phelps did not meet the

Social Security Listing 12.05C for mental retardation; (2) improperly rejecting the findings and

opinions of Phelps's examining psychologist, Dr. Labs, in developing Phelps's RFC; (3) failing

to give adequate explanation for his finding that Phelps did not meet or equal the Listing 12.05C;

(4) improperly rejecting Phelps's complaints.  Because the first issue is dispositive, the

remaining three issues need not be addressed.

Listing 12.05C

      Listing 12.05C for Mental Retardation provides as follows:

> Mental Retardation refers to significantly subaverage intellectual
> functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>
> C.  A valid verbal, performance, or full scale IQ of 60 though 70
> and physical or other mental impairment imposing an additional
> and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05C.  In order to meet or equal Listing 12.05C,

the claimant must show three things: (1) a valid verbal, performance, or full scale IQ of 60

through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental

impairment imposing an additional and significant work-related limitation of function.  Maresh

v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

      The ALJ determined that Phelps did not meet any listed impairment because "[Phelps's]

functional limitations resulting from [her physical impairments] do not meet severity criteria of

any section of Appendix 1.  No examining physician mentioned findings equivalent in severity to

the criteria of any listed impairment." AR 16.  The ALJ also specifically considered listing 12.05

Page 8 - FINDINGS AND RECOMMENDATION

C and found that Phelps did not meet or equal that Listing because "there is no evidence that

[Phelps] had any developmental delays, which were manifested prior to attainment of age 22 . .

. ." AR 17. Specifically, the ALJ found that,

> To the extent IQ testing is relevant to this section, those tests must be seen as supporting a condition during the developmental years as defined. The only available IQ tests for [Phelps] were at age 40. [Phelps] has been able to life [sic] independently, maintain a household, work and even perform duties as a cashier during her adult life. She quit work for reasons other than her alleged limitations resulting from her medically determinable impairments. Further, [Phelps] testified that she did not graduate from high school due to her lack of attendance and not from an inability to perform the schoolwork. While [Phelps] and her mother stated that she could not finish her GED because of a learning disability, the records actually reflect [Phelps] only required some accommodations to get her GED (Exhibit 12F). [Phelps] testified that she never pursued the GED but instead, chose to file for disability benefits.

AR 17.

The Commissioner argues first that the ALJ was correct because no medical source

formally diagnosed Phelps with "mental retardation." According to the Commissioner, such a

diagnosis is required ir order for the claimant to meet the listing in 12.05C. That argument was

specifically rejected by the Eighth Circuit Court of Appeals. Maresh, 438 F.3d at 899 ("[T]his

court disagrees with the Commissioner that [12.05C's] introductory paragraph requires a formal

diagnosis of mental retardation.").

This court agrees with the Eighth Circuit that if the three criteria of 12.05C are satisfied,

then the claimant meets the Listing. A formal diagnosis of "mental retardation" is not required.

In fact, in response to a public comment recommending that the SSA use the definition of mental

retardation found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994)

(DSM-IV), published by the American Psychiatric Association, as the definition of mental

retardation in listing 12.05, the Agency stated,

> The definition of [mental retardation] used by the SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it is also used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing for use of any of the measurement methods recognized and endorsed by the professional organizations.

67 Fed. Reg. 20018-01, at 20022 (April 24, 2002).

The Commissioner admits that Phelps has a valid IQ score between 60 and 70 as well as another impairment imposing significant work-related limitation of function.[4]  The only issue, therefore, is whether the ALJ's determination that the claimant failed to show that onset of the impairment before age 22 is supported by substantial evidence.  The court finds that it is not.

The ALJ noted that the only IQ tests were administered to Phelps at age forty.  AR 17. The SSA has clarified that a claimant is not required to show evidence from the developmental period to establish that the impairment began before the age of 22.  65 Fed. Reg. 50746-01, 50753 (August 21, 2000).  Rather, "[t]he final rules permit [the SSA] to use judgment, based on current evidence, to infer when the impairment began."  Id.  Absent evidence to the contrary, a person's IQ is presumed to remain stable over time.  Maresh at 4 (citing cases).  Here, where there is no evidence in the record that Phelps suffered a major episode in her adult life that would result in a change in her intellectual functioning, the IQ tests administered at age forty

---

[4] Specifically, the ALJ found that Phelps "has the medically determinable impairments of fibromyalgia, degenerative disc disease of the lumbar spine, and organic mental disorder, an affective disorder and a personality disorder.  These impairments cause vocationally relevant limitations and are considered to be 'severe.'"  AR 15.

presumptively reflect her IQ before the age of 22.

The ALJ states that "[Phelps] testified that she did not graduate from high school due to her lack of attendance and not from an inability to perform the schoolwork." AR 17. Phelps's testimony at the hearing, however, did express an inability to keep up with the work:

> I was . . .out of school more than in school because of my seizures. And because I had like 16, 17 a day. And when I got up to high school I didn't even know what I was doing and I started skipping school and stuff. And finally I dropped out because I just didn't know what to do and how to do the work and stuff.

AR 467. Phelps further testified that she has always struggled in school:

> I've always had problems growing up with like reading and understanding things. I always have my mom or somebody with me because I don't remember what is being said or I don't understand it.

AR 471. In her clinical interview with Dr. Labs, Phelps "indicated that she had a great deal of difficulty functioning academically. She was told that she had a learning disability and memory problems. . . . She dropped out of school in the 10th grade due to difficulties understanding what was being taught to her." AR 121.

In a letter dated April 10, 2002, Dr. Labs stated that "[Phelps] has a history of developmental stressors characterized by paternal physical violence towards her mother and inappropriate sexual behavior toward her. [Phelps] developed an apparent grand mal seizure disorder that resulted in significant disability and social isolation during her childhood and teenage years." AR 114. With regard to her academic history and ability, Dr. Labs stated, "since the beginning of her academic career, [Phelps] had significant difficulties in learning resulting in the termination of her formal education in the 10th grade." AR 114. Dr. Labs further stated,

Page 11 - FINDINGS AND RECOMMENDATION

> It was my opinion that [Phelps] demonstrated a learning disorder, not otherwise specified, with specific deficits in auditory processing. Additionally, she demonstrated a cognitive disorder, not otherwise specified, with deficits noted in short-term memory for both verbal and visual information. She appeared to have problems with memory all of her life; however, some of her memory dysfunction at the time of my evaluation may have been related to a mood disorder.

AR 115.

The record does not contain substantial evidence to support the ALJ's determination that Phelps's impairment did not onset before age 22. To the contrary, the record contains evidence that Phelps struggled with intellectual functioning from an early age. Phelps consistently reported and testified that school was difficult for her and that she struggled with reading, memory and spelling. See, e.g., AR 89, 121, 195, 273.

In support of his decision that Phelps did not meet Listing 12.05C, the ALJ stated that Phelps had been able to live independently, maintain a household, work and even perform duties as a cashier during her adult life. The records, however, shows that Phelps relied upon her mother to pay her bills, AR 83, 88, and her fifteen year-old daughter to help with cooking and housework, AR 80, 87. In addition, Phelps testified at her hearing that she was able to handle money and cashiering with "a lot of help." AR 471.

Finally, the ALJ states that "[w]hile [Phelps] and her mother stated that she could not finish her GED because of a learning disability, the records actually reflect [Phelps] only required some accommodations to get her GED." AR 17. In fact, Barbara Cates, who performed the Portland Community College evaluation, wrote in her report, "[Phelps's] overall cognitive abilities in the Borderline range as well as extremely low basic skills indicate successful completion of the GED program will be extremely challenging." AR 275. Likewise, Dr. Labs

Page 12 - FINDINGS AND RECOMMENDATION

concluded that "due to her extremely low basic skills that successful completion of the GED program would be challenging for [Phelps]." AR 122.

## CONCLUSION

For the foregoing reasons, this court finds that Phelps meets or equals Listing 12.05C and is therefore disabled as of 1999, when Phelps was diagnosed with fibromyalgia and osteoarthritis. The court recommends reversing and remanding the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g) for the calculation and award of benefits.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due January 3, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 20th day of December, 2006.

       /s/ Paul Papak
       Honorable Paul Papak
       United States Magistrate Judge

Page 13 - FINDINGS AND RECOMMENDATION